**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| **POTOMAC SUPPLY CORP.** | ) | **Case No. 12-30347-BFK** |
| | ) | **Chapter 7** |
| Debtor | ) | |
| | ) | |
| **CHESAPEAKE TRUST** | ) | |
| Plaintiff | ) | |
| vs. | ) | **Adversary Proc. No. 13-03073** |
| | ) | |
| **CHESAPEAKE BAY ENTERPRISES, INC.** | ) | |
| Defendant | ) | |

**OPINION GRANTING SUMMARY**
**JUDGMENT TO THIRD PARTY DEFENDANTS**
**ON COUNTS II THROUGH V OF THE**
**FIRST AMENDED THIRD PARTY COMPLAINT**

This matter is before the Court on the Motion of Third Party Defendants Pillsbury

Winthrop Shaw Pittman, LLP, Patrick Potter and Jerry Hall (hereinafter, collectively,

"Pillsbury"), to Dismiss Counts II through V of the Defendant's First Amended Third Party

Complaint. Docket No. 108. The Defendant, Chesapeake Bay Enterprises, Inc. (hereinafter,

"CBE") has filed an Opposition to the Motion. Docket No. 118. Pillsbury has filed a Reply

Memorandum. Docket No. 119. The Court heard the arguments of the parties on March 18,

2014. For the reasons stated below, the Motion will be granted.

**Undisputed Facts**

While much of what has transpired between these parties remains the subject of vigorous

factual dispute (and the Court, therefore, denied competing Motions for Summary Judgment on

the underlying claims between Chesapeake Trust and CBE), the following facts are not

genuinely in dispute:

1.      Potomac Supply Corporation ("Potomac") was a company located in Kinsale, Virginia. Kinsale is located in Virginia's Northern Neck region. Potomac was in the business of manufacturing and processing wood products. It filed a voluntary petition under Chapter 11 in this Court on January 20, 2012.

2.      At the time that it filed for bankruptcy, Regions Bank was Potomac's primary secured lender. Potomac's obligations to Regions Bank were in excess of $17,000,000, as of the filing of the case. Regions Bank Proof of Claim No. 118.[1]

3.      Pillsbury was retained to act as Potomac's bankruptcy counsel. Pillsbury's employment as counsel for the Debtor in Possession was approved by the Court on February 21, 2012. Docket No. 97. The law firm of LeClair Ryan was approved as counsel for the Official Committee of Unsecured Creditors. Docket No. 209.

4.      On March 2, 2012, only six weeks into the case, Regions Bank filed both a Relief from Stay Motion with respect to its collateral and a Motion to Convert the case to Chapter 7. Docket Nos. 129 and 130. The Committee responded to the latter motion by advising the Court that, in its view, a reorganization was unlikely, but that the Debtor should be given enough time to complete a going-concern sale of its assets, if possible. Docket No. 164.

5.      Other creditors filed motions for relief from stay with respect to their collateral. Docket Nos. 125 (Toyota Motor Credit); 133 (Land and Sea Forest Products of Pennsylvania).

---

[1] The Court can take judicial notice of documents filed with the Court. *See, e.g.*, *Witthohn v. Fed. Ins. Co.*, 164 Fed.Appx. 395, 397 (4th Cir. 2006); *In re Harmony Holdings, LLC*, 393 B.R. 409, 414 (Bankr. D.S.C. 2008).

A. *The Motion to Sell the Debtor's Core Assets and the CBE Deposit of $500,000.*

6.      The case quickly turned into a liquidating Chapter 11. On May 4, 2012, the Court

approved the employment of Morgan Joseph Triartisan, Inc., as Investment Banker for the

Debtor. Docket No. 254.

7.      On July 27, 2012, the Debtor filed a Motion for Orders Approving: (A) Auction

Procedures, (B) the Sale of Substantially all of the Debtor's Assets Free and Clear of All Liens,

Claims, Interests and Encumbrances, and (C) Notice of Auction and Auction Procedures (the

"Auction Procedures Motion"). Docket No. 335. For purposes hereof, the assets which were the

subject of this Motion are referred to as "the Core Assets." The Court approved this Motion by

Order entered on August 16, 2012. Docket No. 370. The Order was amended on August 17,

2012. Docket No. 374. The Debtor also filed a Notice of Approval of Auction Procedures for the

Sale of Substantially all of the Debtor's Assets. Docket No. 375. The auction was scheduled for

September 19, 2012, at 10:00 a.m., in Pillsbury's offices in Washington, D.C. *Id.*

8.      The Debtor also filed a Motion for Order Approving Procedures to Sell Certain

Non-Core Real Property Free and Clear of all Interests without Further Order of Court. Docket

No. 371.

9.      Throughout this period of time, the Debtor simultaneously was negotiating with

CBE for the sale of its Core Assets. CBE is a Virginia corporation owned by members of the

Haynie family, who are also located in Virginia's Northern Neck. Docket No. 87, First Amended

Third Party Complaint, ¶¶ 8-11. The Haynie family has been involved in farming and agriculture

in the Northern Neck for five generations. *Id*., ¶ 10.

10.     On September 13, 2012, in anticipation of the execution of an Asset Purchase

Agreement, Mr. Hall of Pillsbury provided CBE's counsel, Mr. Maddock, with wiring

instructions, so that CBE could provide the Debtor with a good faith deposit. Docket No. 148,

Haynie Aff., Ex. 2. The wiring instructions stated:

> Bank:                Wells Fargo Bank
>
> ABA:                 121000248
>
> Swift Code:          WFBIUS6S
>
> Account Number:  20000057[XXXXX]
>
> Beneficiary:         (Pillsbury Winthrop Shaw Pittman LLP – in Trust for Client Name)
>
> Other Information: (Attorney Name & Client/Matter Number)

11.     On September 17, 2012, Mr. Hall of Pillsbury e-mailed Mr. Maddock, CBE's

counsel, stating as follows:

> As I mentioned, I view it as critical that we get an APA and deposit. I hope the below
> helps you with your client on these Issues (especially, sending the wire right away).
> Without the wire and APA, I will have a very uphill battle in the face of the incoming
> bids, all of which are being supported by cash deposits. To make the case for halting the
> auction, the Haynies have to show that they are as serious as the bidders.

Docket No. 118, Ex. B.

12.     On September 17, 2012, CBE wired $50,000 to Pillsbury. Mr. Haynie's

instructions for the wire to his bank, Essex Bank, stated: "Originator to Beneficiary Information:

IN TRUST FOR CHESAPEAKE BAY ENT JERRY HALL BID ON POTOMAC SUPPLY

CORPORATION." Docket No. 148, Ex. 3.

13.     On September 18, 2012, CBE wired an additional $450,000 to Pillsbury. CBE's

instructions to its bank, Bank of Lancaster, communicated via a fax from CBE's attorneys' (Mr.

Kudliff's) office, for the $450,000 wire did not contain similar "In Trust" language, *Id*., Ex. 7,

though Mr. Kudliff sent an e-mail to, among others, Mr. Hall, on September 18th stating that

"these funds were wired in trust for Chesapeake Bay Enterprises re: Jerry Hall bid on Potomac

Supply Corporation." *Id.,* Ex. 8. The wire confirmation for the $450,000 states: "In Trust for

Chesapeake Bay Enterprises." *Id.,* Ex. 9.[2]

14.     At the time, CBE had a lending commitment from Great Eastern Investment

Fund, LLC, in the amount of between $34,000,000 and $38,000,000. *Id.*, Ex. 1.

15.     On September 20, 2012, the Debtor filed a First Auction Supplement with the

Court, which stated: "Potomac hereby advises the Court that during the process conducted by

Potomac on September 19, 2012, by consent of Potomac, Regions Bank and the Unsecured

Creditors Committee, the process was adjourned without date, though subject to adequate notice

to all creditors and parties in interest." Docket No. 402.

16.     On September 21, 2012, CBE as purchaser, and Potomac as seller, entered into an

Asset Purchase Agreement (hereinafter, the "APA") for the sale of the Debtor's Core Assets.

Docket No. 148, Ex. 12. The purchase price was $20,338,000, plus and minus certain closing

adjustments. *Id.*, ¶ 2.1.1. The APA required a $500,000 deposit at its execution, and an

additional $500,000 deposit within 15 days thereafter, i.e., by no later than October 6, 2012,

"pursuant to an escrow agreement to be executed by Seller, Buyer and the Deposit Escrow

Holder on or before the Execution Date." *Id*., ¶ 2.1.2. It is not disputed that a separate escrow

agreement was never executed by the parties. [3]

---

[2]  It is not clear from the record what the initial $50,000 deposit was for – it may have been a deposit for the purchase of the Non-Core Assets. However, it is clear that as of the additional $450,000 deposit, CBE elected to treat the entire $500,000 deposit as a deposit under a to-be-executed Asset Purchase Agreement for the Core Assets. Docket No. 148, Ex. 5. ("Confirming that Mr. Haynie will wire $450k. Would like to add the $50k send [sic] yesterday Total $500k.")  For purposes hereof, the Court will refer to the $50,000 and the $450,000 together as the Deposit.

[3]  The fully signed APA was transmitted by CBE's counsel to the Pillsbury attorneys on Saturday, September 22nd, by e-mail. *Id.*, Ex. 12, p. 1.

17.     The APA provides for delivery of the Deposit to the Seller in the event of a Buyer

Default Termination. *Id*., ¶ ¶ 2.1.2, 4.4.2. Similarly, the APA provides for a return of the Deposit

to the Buyer, in the event of a Seller Default Termination. *Id*., ¶ ¶ 2.1.2, 4.4.1.

18.     The APA provided for an Outside Closing Date 45 days after the Effective Date

of the Agreement, which would have been November 6, 2013. *Id.*, ¶ 3.2.

19.     Both parties had certain contractual obligations prior to closing. *Id.*, ¶¶ 4.1

(Conditions to Seller's Obligations), 4.2 (Conditions to Buyer's Obligations). Among the

Buyer's pre-closing obligations was the duty to ensure that all representations and warranties

were true in all material respects, and that that obligations of the Buyer prior to the closing shall

had been performed in all material respects. *Id.*, ¶ 4.1.1. Among the Seller's pre-closing

obligations were the requirements that: (a) the Bankruptcy Court shall have entered the Approval

Order approving the sale; (b) the Auction Procedures Motion shall have been fully and

completely withdrawn; and (c) the Auction Procedures Order shall have been fully and

completely vacated and of no further force or effect. *Id.*, ¶¶ 4.2.4, 4.2.5, 4.2.6.

20.     The APA provides: "<u>Financing</u>. Buyer has sufficient funds available to

consummate the transactions contemplated by this Agreement." *Id.*, ¶ 6.4.

21.     On September 24, 2012, the Debtor filed a Notice of Withdrawal of the Auction

Procedures Motion. Docket No. 403. In its Notice of Withdrawal, the Debtor noted: "No

objection to the Motion is pending; accordingly withdrawal of the Motion is appropriate." The

Committee and Regions Bank filed a Joint Objection to this Notice of Withdrawal, asserting that

the Notice of Withdrawal violated a prior Order of the Court and that the Auction Procedures

Motion could not be withdrawn unilaterally under Bankruptcy Rule 7041. Docket No. 416.

22.     On September 26, 2012, the Debtor filed a Motion for an Order Approving the Sale of Certain of the Debtor's Assets Free and Clear of All Liens, Claims, Interests and Encumbrances to CBE. Docket No. 412 (the "Core Assets Sale Motion").

23.     Six days after the Debtor filed the Core Assets Sale Motion, on October 2, 2012, CBE's counsel wrote to the Debtor's counsel, advising Debtor's counsel that the Great Eastern funding had fallen through, and that CBE was not in a position to close. Docket No. 1, Complaint, Ex. E.[4]

24.     CBE and the Debtor entered into an Amendment to the APA on October 5, 2012, giving CBE until October 10, 2012, in order to post the required additional $500,000 deposit. *Id.*, Ex. G. The Debtor agreed to a further extension of time, through and including October 12, 2012. *Id.*, Ex. I. No further extensions of time were agreed to by the parties and the second $500,000 deposit was never paid.

25.     The Court held a hearing on November 6, 2012, at which the Debtor moved orally to withdraw its Notice of Withdrawal, which the Court granted. Docket No. 465. The Court's approval was incorporated into a Consent Order Granting Debtor's Oral Motion to Withdraw Notice of Withdrawal, which was endorsed by counsel for the Debtor (Pillsbury), counsel for Regions and counsel for the Committee. Docket No. 474.

   *B.  The Compromise Motion and CBE's Demand for the Return of its Deposit.*

26.     On November 8, 2012, the Committee filed a Motion for approval of a compromise under Bankruptcy Rule 9019. Docket No. 471 ("the Compromise Motion"). The proposed compromise essentially provided a carve-out to the professionals from Regions Bank's

---

[4]  At the hearing on the summary judgment motions with respect to the Deposit, CBE acknowledged that the October 2nd letter was an event of default, but asserted that the Debtor already was in material breach at the time of this default or, alternatively, that the Debtor had waived this event of default.

Core Assets collateral: (a) $167,000 to Morgan Joseph TriArtisan (representing one-third of its fee); (b) $196,335.24 to Pillsbury (which, it was represented, was approximately one-third of the fees then owed to Pillsbury); and (c) $95,500 to LeClair Ryan as Committee counsel (or one-half of the fees to which it was entitled).  *Id.* With respect to the Chesapeake Deposit of $500,000, the Motion also provided that Pillsbury would be entitled to: (a) any fees it incurred in connection with the Deposit; and (b) an additional $240,000, should it be entitled to retain the Deposit. In the event that there were any funds left over from the Deposit, they would be split one-third to Pillsbury, one-third to Regions and one-third to the Unpaid Administrative Claims Pool. *Id.* CBE filed a Reservation of Rights with respect to the Deposit. Docket No. 479.

27.     The Court approved the Compromise Motion by Order entered on November 13, 2012. Docket No. 485 (the "Settlement Order").

28.     The same day, the Court also approved the sale of the Core Assets to Potomac Supply, LLC, a Delaware limited liability company, and a subsidiary of American Industrial Products ("AIP") for the sum of $10,000,000, subject to certain purchase price adjustments. Docket No. 488.

29.     Also on November 13, 2012, CBE demanded the return of its $500,000 Deposit, noting that the sale of the Core Assets to AIP made a sale to CBE impossible, and asserting that Potomac was in default under the APA for its alleged failure to pursue bankruptcy court approval of the sale to CBE. Docket No. 148, Ex. 13.

30.     On November 27, 2012, CBE filed a Motion to Reconsider the Court's Order approving the sale of the Core Assets to Potomac Supply, LLC. Docket No. 501. In its Motion, CBE represented: "As filed, the Chesapeake APA contained certain conditions precedent with respect to financing. Now, however, these conditions precedent have been eliminated and

Chesapeake is prepared to move forward with the Chesapeake APA **without any financing contingencies.**" *Id.*, ¶ 9 (emphasis in original). CBE represented that it was willing to pay $15,000,000 for the assets, subject to certain closing adjustments. *Id.*, ¶ 10. CBE filed a Notice of Withdrawal of this Motion on December 11, 2012. Docket No. 516.

> *C.  The Case is Converted to Chapter 7.*

31.     The case was converted to Chapter 7 by Consent Order on January 24, 2013. Docket No. 538. The Order converting the case approved the establishment of the Chesapeake Trust and the transfer of the estate's causes of action with respect to the Deposit to the Trust. *Id.,* ¶ 8. Pillsbury, Regions Bank and the bankruptcy estate are the beneficiaries of the Trust, with their interests in the Trust property mirroring the amounts and priorities approved in the Settlement Order. *Id.,* Ex. A (Trust Agreement). Pillsbury is the Trustee of the Trust and has sole decision-making authority with respect to any litigation or settlement with respect to the Fund Rights that are the subject of the Trust. *Id.*, ¶ 7.

32.     CBE filed a Motion for Aid, Guidance and Leave to file State Court Action against Pillsbury, or in the Alternative, to Compel Return of $500,000. Docket No. 551. This Motion was denied on September 18, 2013. Docket No. 675.

33.     Pillsbury filed a Motion to Authorize Transfer of Seller Rights to the Trust. Docket No. 566. CBE objected. Docket No. 581. This Motion was denied on April 11, 2013. Docket No. 597.

34.     The Court approved Pillsbury's final Third Interim and Fee Application on April 3, 2013, awarding the firm $424,924.70 in fees and $13,252.52 in expenses (which was in addition to the firm's previously awarded fees and expenses). Docket No. 589.

35.     Chesapeake Trust filed this adversary proceeding on April 9, 2013.

D.  *The Post-Conversion Disposition of the Deposit*.

36.     The parties agreed at the hearing on this Motion that the $500,000 Deposit is still

sitting in Pillsbury's attorney trust account. The funds have not been transferred out of the

account. Pillsbury represented to the Court that the funds will not be transferred out of its trust

account until the Court orders a disposition of the funds.

## Conclusions of Law

This Court has jurisdiction pursuant to 28 U.S.C. 1334 and the Order of Reference of the

District Court for this District of August 15, 1984. This is a non-core proceeding under 28 U.S.C.

§ 157(c)(1), but one for which CBE has consented to the entry of final orders by the bankruptcy

court. *Chesapeake Trust v. Chesapeake Bay Enterprises, Inc.*, 2014 WL 202028 (E.D. Va. 2014)

(denying motion to withdraw the reference, finding that this action is non-core, and finding that

CBE has consented to the entry of final orders by the bankruptcy court).

Chesapeake Trust and CBE both filed Motions for Summary Judgment, supported by

Affidavits, on the underlying issue of which party is entitled to the Deposit. Docket Nos. 108 and

147. The Court denied both Motions, finding that there were material facts in dispute. The parties

have relied upon, and the Court has reviewed, the same Affidavits in connection with this

Motion. Accordingly, while the Third Party Defendants' Motion began as a Motion to Dismiss,

the matters argued have gone beyond the allegations contained in the First Amended Third Party

Complaint. The Court, therefore, will treat the Motion as one for summary judgment.

Bankruptcy Rule 7012 (incorporating F.R. Civ. Pro. 12(d)).

Summary judgment is appropriate where there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Bankr. P. 7056. The

moving party has the initial burden of showing that there are no material facts in dispute, and that

it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24

(1986). When the moving party has met its initial burden, the burden then shifts to the

nonmoving party to present specific facts demonstrating that there is a genuine issue for trial.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986).

Whether a fact is material or not depends on the substantive law at issue in the case.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Only disputes over facts that might

affect the outcome of the suit under the governing law will properly preclude the entry of

summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as

an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy

and inexpensive determination of every action.' Fed.Rule Civ.Proc. 1." *Celotex Corp.*, 477 U.S.

at 327.

There are four Counts at issue in this Motion, constituting the four Counts remaining

from CBE's First Amended Third Party Complaint. They are: (a) Count II – Actual Fraud and

Fraud in the Inducement; (b) Count III – Conversion; (c) Count IV – Breach of Fiduciary Duty;

and (d) Count V – Negligence. The parties agree that Virginia law controls. The Court will

address each Count, in turn.[5]

## I.    Count II – Actual Fraud and Fraud in the Inducement.

In order to prove a claim for actual fraud, the claimant must provide evidence of "(1) a

false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent

---

[5] Count I of the First Amended Third Party Complaint was dismissed on October 9, 2013. Docket No. 107. Counts
VI and VII were dismissed on December 31, 2013. Docket Nos. 127 and 128. Thus, Counts II – V are all of the
remaining Counts in the First Amended Third Party Complaint.

to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." *Bank of America, N.A. v. Sands*, 488 Fed.Appx. 704, 708 (4th Cir. 2012) (unreported) (quoting *Nationwide Ins. Co. v. Patterson*, 229 Va. 627, 331 S.E.2d 490, 492 (1985)); *Maaraba v. Stanley Convergent Sec. Solutions, Inc.,* 2014 WL 1255210, at *1 (E.D. Va. 2014) (quoting *Prospect Dev. Co., Inc. v. Bershader,* 258 Va. 75, 515 S.E.2d 291 (1999)). In order to make a claim for fraudulent inducement, the claimant must show "that the defendant made misrepresentations [that] were positive statements of fact; made for the purpose of procuring the contract; that they are untrue; that they are material; and that the party to whom they were made relied upon them, and was induced by them to enter into the contract." *County of Grayson v. RA-Tech Servs., Inc.,* 2014 WL 971697, at *2 (W.D. Va. 2014); *Enomoto v. Space Adventures, Ltd*., 624 F. Supp. 2d 443, 452 (E.D. Va. 2009). The difference is in the form of the remedy – for a breach of contract, CBE would be entitled to damages; for a claim of fraud in the inducement, CBE would be entitled either to damages or to rescission and a return of its Deposit. *See Persaud Companies, Inc. v. IBCS Group, Inc.,* 425 Fed.Appx. 223 (4th Cir. 2011) (unreported); *George Robberecht Seafood, Inc. v. Maitland Bros. Co*., 220 Va. 109, 255 S.E.2d 682, 683 (1979). For a claim of fraud in the inducement, the plaintiff must elect whether to sue for damages, or seek rescission and restitution. "A party may not do both." *Med-Therapy Rehabilitation Services, Inc. v. Diversicare Corp. of America,* 16 F.3d 410 (4th Cir. 1994) (Table); *Miller v. Premier Corp*., 608 F.2d 973, 983 (4th Cir. 1979).

The right to rescission and a return of the Deposit for fraudulent inducement assumes that Pillsbury and its attorneys were acting as Potomac's agents in making the allegedly fraudulent statements and in inducing CBE to enter into the APA. *Whalen v. Rutherford*, 2013 WL

3174702, at *3 (W.D. Va. 2013) ("a principal may be held liable for the fraud of his agent"). The Court makes that assumption for purposes of this Opinion and Order.

The Court will examine each of the statements alleged by CBE to constitute fraud, or that are alleged to have fraudulently induced CBE to enter into the APA.

1.   *The Urgency of the Need for the Wire.*

CBE first alleges that Mr. Hall's e-mail of September 17th was materially false when it stated: "I view it as critical that we get an APA and deposit." In CBE's view, this falsely represented the urgency of the need for a wire transfer. Docket No. 118, CBE Opposition, p. 32. This statement, however, is not a statement of an existing fact, nor is it a statement made without the present intent to perform. It is a statement of opinion. *See Glaser v. Enzo Biochem, Inc.,* 126 Fed.Appx. 593, 600 (4th Cir. 2005) ("The statement in a press release that 'all remained well' at Enzo is vague and indefinite, a commendatory statement, or puffery that cannot give rise to an actionable fraud claim"); *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004) ("the judiciary has long distinguished between mere puffing statements utilizing opinion and exaggeration to pitch a sale, on the one hand, and factual statements that constitute fraudulent misrepresentations, on the other"). No representation of existing fact was made here.

Moreover, it was perfectly reasonable for Mr. Hall to conclude that there *was* some urgency to getting a wire in. As found above, Regions Bank, the Debtor's senior secured lender had filed a Motion for Relief from the Automatic Stay with respect to all of its collateral, and had filed a Motion to Convert the case to Chapter 7. Docket Nos. 129 and 130. Clearly, the Debtor had lost the confidence of its secured lender. Other creditors had filed relief from stay motions. The Creditors Committee had already advised the Court that, in its view, a reorganization was

13

unlikely. Under the circumstances, it was perfectly reasonable for Mr. Hall to convey a sense of urgency to CBE's counsel, for the Deposit.

  2.  *The Statement that Pillsbury Intended to Hold the Funds in Trust*
      *for the Benefit of CBE.*

CBE next argues that the Pillsbury attorneys represented that the Deposit would be held in trust for CBE's benefit. Docket No. 118, p. 32. It is not clear from the record that anyone from Pillsbury actually said this. The APA provides that "Buyer shall deposit in escrow with an escrow agent (the 'Deposit Escrow Holder') mutually agreed on by Seller and Buyer… pursuant to an escrow agreement to be executed by Seller, Buyer and the Deposit Escrow Holder on or before the Execution Date," but Pillsbury was not a signatory to the APA. Taking the facts in the light most favorable to the non-moving party, CBE, and assuming that the wire transfer instructions, confirmations and surrounding e-mails would lead one to conclude that the funds were to be held in trust for CBE's benefit, the undeniable fact is: the funds haven't gone anywhere. They are still on deposit, in Pillsbury's trust account. CBE has not been harmed by the statement (inferred from the surrounding circumstances) to the effect the Deposit would be held in Trust. The funds are still on deposit, awaiting a ruling from this Court as to their disposition. CBE cannot possibly claim to be harmed as a result of this statement.

Further, it is difficult to understand how CBE can claim that it was fraudulently induced to enter into the APA by the statement that its Deposit would be held "in trust." CBE wired the Deposit to Pillsbury with the understanding that it would be held by Pillsbury pending the execution of an escrow agreement in accordance with the terms of Section 2.1.2 of the APA. CBE wired the funds on September 17 and 18, a few days in advance of its execution of the APA on September 21st or 22nd. CBE could have insisted that the escrow agreement be executed and the Deposit Escrow Holder identified "on or before the Execution Date" in accordance with

Section 2.1.2 of the APA.[6] CBE could have refused to wire its Deposit until the escrow

agreement was executed and the Deposit Escrow Holder identified. CBE chose instead to wire

the Deposit to Pillsbury before the APA was signed and before the escrow agreement was

prepared and executed. In other words, CBE received precisely what it legitimately expected as

of the execution of the APA and at the time it wired the Deposit – that the funds would be held

by Pillsbury until the Deposit Escrow Holder was identified and the escrow agreement was

executed. CBE cannot claim to have been fraudulently induced by the statement, express or

implied, that its Deposit would be held in trust.[7]

   *3.   The Statement that the Funds Would be Held in an Interest Bearing Account.*

   CBE asserts finally that Pillsbury falsely represented that the funds would be held in an

interest bearing account. Docket No. 118, p. 33. The problem here is that there is no evidence

that anyone from Pillsbury ever said this, and it cannot fairly be inferred from the wire transfer

requests, confirmations and surrounding e-mails. There is no communication to Pillsbury from

CBE or its counsel that CBE had an expectation that Pillsbury would hold the funds in an interest

bearing account. The APA states: "Upon receipt of the Deposit, the Deposit Escrow Holder shall

immediately deposit the Deposit into an interest-bearing escrow account." APA, ¶ 2.1.2. The

parties never identified the Deposit Escrow Holder and an escrow agreement was never

executed. CBE had no legitimate expectation that its Deposit would be held in an interest bearing

account by Pillsbury, in anticipation of an escrow agreement being executed. It had a legitimate

contractual expectation that the Deposit eventually would be held by the Deposit Escrow Holder

---

[6] The Execution Date is defined in the APA as "the mutual execution and delivery of this Agreement on the date
first written above," which is September 21, 2012. APA, ¶ 2.1.2(i).

[7] Of course, CBE's Count V, the Breach of Fiduciary Duty Count, assumes that the funds *are* being held in trust by
Pillsbury. CBE is entitled to plead in the alternative. Bankruptcy Rule 7008 (incorporating Fed. R. Civ. P. 8(d)(3):
"A party may state as many separate claims or defenses as it has, regardless of consistency.")

in an interest bearing account, but the Deposit Escrow Holder was never identified and the escrow agreement was never executed.[8]

The case of *Whalen v. Rutherford,* 2013 WL 3174702 (W.D. Va. 2013), on which CBE relies, is readily distinguishable from the case at hand. *Whalen* essentially involved a domestic situation between Ms. Whalen and Mr. Rutherford. They executed one agreement (the "First Agreement") in which Mr. Rutherford agreed to be responsible for the payment of the mortgage, insurance and taxes on a property they owned jointly as tenants in common. They then executed a Second Agreement, which shifted the responsibility to pay the mortgage, insurance and taxes to Ms. Whalen. The Second Agreement was executed by Ms. Whalen under rushed circumstances, only five minutes before the attorney's office was set to close, and Ms. Whalen was only shown the signature page. She claimed that Mr. Rutherford's agent represented to her that the only change to the agreement was the deletion of a paragraph requiring her to maintain property and casualty insurance on the property, which previously had been stricken from the First Agreement. "The actual changes to the Second Agreement, which required her to make the mortgage, insurance, and tax payments, were not disclosed to her." *Id.,* at *2. This kind of blatant deceit is very different from what happened in this case, where as noted, CBE wired the funds to Pillsbury two or three days before the APA was even executed, and without any legitimate expectation that Pillsbury would hold the funds in an interest bearing account until the Deposit Escrow Holder was identified.

In the end, there is nothing in the record to suggest that Pillsbury ever represented, impliedly represented, or stayed silent in the face of a legitimate expectation, that the funds

---

[8] It also has to be remembered that CBE sought and obtained two extensions of time to make the second $500,000 Deposit, without ever submitting a draft escrow agreement to Potomac or Pillsbury, and without ever demanding that the funds be placed in an interest bearing escrow account.

would be held in an interest bearing account. The Court will grant summary judgment on Count II.

## II.      Count III – Conversion.

A claim for conversion requires proof of a "wrongful exercise or assumption of authority ... over another's goods, depriving him of their possession." *Condominium Services, Inc. v. First Owners' Ass'n of Forty Six Hundred Condominium, Inc.,* 281 Va. 561, 574, 709 S.E.2d 163, 171 (2011). "'Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion.'" *Id.* (quoting *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 76, 92 S.E.2d 359, 365 (1956)). "An action for conversion can be maintained only by one who has a property interest in and is entitled to the immediate possession of the thing alleged to have been wrongfully converted." *United Leasing Corp. v. Thrift Ins. Corp.,* 247 Va. 299, 305, 440 S.E.2d 902, 906 (1994); *Mullins v. Sutherland,* 131 Va. 547, 554-55, 109 S.E. 420, 423 (1921).

CBE's claim for conversion fails because it lacks the right to immediate possession of the Deposit. The *Condominium Services* case relied upon by CBE, is entirely distinguishable from the facts of this case. *Condominium Services* involved a dispute between a condominium unit owners' association (the FOA), and its terminated management company, CSI. CSI opened a bank account by falsely representing that it had the authority of the FOA to do so, and directed the condominium unit owners to send money owed to FOA. 709 S.E.2d, at 167. This fraudulent conduct occurred *after* the Management Agreement between CSI and FOA had been terminated. *Id.* This is precisely the opposite of what happened in this case, where CBE wired its Deposit before the APA was executed.

CBE maintains that this case is just like *Condominium Services* because "[t]he conversion occurred _**after**_ the APA was terminated." Docket No. 118, p. 35 (emphasis in original). This logic completely ignores the fact that Pillsbury had a non-frivolous claim to the Deposit, once the APA had been terminated. CBE simply assumes that it has an undisputed right of possession in the funds. Docket No. 118, p. 35 ("After November 13, 2012, CBE had a right to immediate possession of its funds… Pillsbury cannot say that it had any right to retain CBE's funds after McGuire Woods [CBE's counsel] terminated the APA and after the assets were sold to AIP because that position is legally unsupportable and indefensible.") But, just saying that a position is legally indefensible does not make it so. The question of which party, Chesapeake Trust or CBE, is entitled to the Deposit is a matter that is highly contested. The Court has denied both parties' motions for summary judgment, finding that there are material facts in dispute. Each party claims that the other committed the first material breach of the APA, or alternatively that certain breaches were waived. CBE demands the return of its deposit. Chesapeake claims that the Deposit has been forfeited, and that it is entitled to retain the Deposit. This is hardly the stuff of an indisputable right to immediate possession.

The remaining authorities upon which CBE relies are distinguishable because in those cases, the defendant actually and wrongfully misappropriated (in the words of the law of conversion, exercised dominion and control over) the funds. *See Three Rivers Landing of Gulfport, LP v. Three Rivers Landing, LLC,* 2013 WL 5492936, at *6 (W.D. Va. 2013) ("the undisputed and specific facts relied on by Plaintiffs in their supporting memorandum, including the Lioy Report (an expert report unchallenged by Defendants) and Kinser's own testimony, establish that at least $2.7 million in Partnership funds were converted by the Former General Partner and improperly paid to Unlimited and other third parties involved in other unrelated

projects of Kinser's"); *Gordon v. Pete's Auto Service of Denbigh, Inc.,* 838 F. Supp. 2d 436, 440-41 (E.D. Va. 2012) ("in transferring title to the vehicle to itself, and then subsequently to a third party, Pete's Auto Service exercised dominion or control over Gordon's property, thus depriving Gordon of possession"); *Metropolitan Life Ins. Co. v. Hunter*, 2013 WL 2156326, at *2 (E.D. Va. 2013) ("On April 21, 2007, Plaintiff paid Defendant FEGLI proceeds as a result of incorrect information provided by Mrs. Hunter's employing agency. After disbursing $80,440.59 of FEGLI proceeds, the United States Office of Personnel Management ('OPM') notified Plaintiff that Mrs. Hunter's employing agency incorrectly certified that she was entitled to FEGLI proceeds. Mrs. Hunter executed Life Insurance Election form 2817 waiving all life insurance and thus, Defendant was not entitled to receive the insurance proceeds. Although Plaintiff requested return of the funds by letter on October 8, 2007, Defendant has not returned the funds.") (citations to the record and footnotes omitted).[9]

As well, in *Pace Airlines, LLC v. Professional Settlement Services, LLC,* 2010 WL 480977 (N.D. Ohio 2010), the escrow agent returned the deposit to the purchaser, Global (actually, to Ms. Jones, the party that had loaned the money to the purchaser), without the consent of the seller, Pace. In this case, Pillsbury has done no such thing. Pillsbury has simply retained the funds in its trust account, subject to a determination by this Court as to the rightful owner.

Under the circumstances, Pillsbury did precisely what it should have done. It either could have interplead the Deposit (*See* Bankruptcy Rule 7022), or it could have held the funds in its trust account, pending a determination by the Court as to the disposition of the funds. Under

---

[9] *Metropolitan Life Insurance* involved the District Judge's acceptance of a Magistrate Judge's Report and Recommendation on a default judgment motion.

Virginia Rule of Professional Conduct 1.15(b)(5), an attorney has a specific duty "not [to]

disburse funds or use property of a client or third party without their consent or convert funds or

property of a client or third party, except as directed by a tribunal." CBE argues that Pillsbury is

not entitled to rely on Rule 1.15 because it was not acting as counsel in accepting the funds;

rather it was an escrow agent. Docket No. 118, p. 38 ("Pillsbury's attempt to hide behind

Virginia's Rules of Professional Conduct is shameful and disingenuous… Pillsbury was not

acting as an attorney or law firm when it accepted CBE's $500,000.") (Emphasis in original).

CBE, however, knew full well that it was dealing with Potomac's counsel, and knew without

question that Pillsbury was a law firm, at the time it made the Deposit.

Further, Rule 1.15 does not "shield" attorneys from liability. To the contrary, Rule 1.15 is

consistent with the duties of any common law agent either to interplead the funds or to maintain

them until there is a court-ordered disposition. *See International Fidelity Ins. Co. v. Western

Virginia Water Auth.*, 2012 WL 2357368, at *4 (W.D. Va. 2012) (noting that an escrow agent

has fiduciary duties with respect to funds entrusted to it and citing Restatement (Third) of

Agency § 8.08 (2006), for the proposition that "[s]ubject to any agreement with the principal, an

agent has a duty to the principal to act with the care, competence, and diligence normally

exercised by agents in similar circumstances"); *Winslow, Inc. v. Scaife,* 219 Va. 997, 1000, 254

S.E.2d 58, 60 (1979) ("in an escrow arrangement, the parties occupy a principal-agent

relationship, a relationship which is essentially contractual in nature").[10]

---

[10] Similar rules are used in other jurisdictions. *See, e.g., Accident & Injury Medical Specialists, P.C. v. Mintz,* 279 P.3d 658, 664 n.6 (CO 2012) ("Where there is a dispute as to the validity or amount of the third party's claim, the lawyer should retain the disputed property in trust while he attempts to negotiate a settlement between the client and third party. If the parties fail to agree, the lawyer should interplead the property for disposition by the court.") (internal quotations and citations omitted). *See also* Rule 1.15, Safekeeping Property, Ann. Mod. Rules Prof. Cond. § 1.15(e) ("When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interest, the property shall be kept separate by the lawyer until the dispute is resolved.")

The Court will grant summary judgment on Count III because CBE does not have an immediate right to possession of the funds.

### III.    Count IV – Breach of Fiduciary Duty.

Much ink has been spilled, and a great deal of argument presented, over whether Pillsbury occupies the position of a fiduciary with respect to CBE and the Deposit. The Court will assume for purposes of this Motion that Pillsbury occupies the position of a fiduciary. But, whether one calls Pillsbury a fiduciary or an escrow agent (as noted above, there is no meaningful distinction to be made, with respect to the Deposit), the result is the same. Count IV will be dismissed for the simple reason that Pillsbury hasn't breached any fiduciary duties to CBE. Again, Pillsbury is holding the Deposit in its trust account subject to a Court determination of its rightful owner. Under these circumstances, Pillsbury has not breached any fiduciary duties to CBE.

The Court will grant summary judgment on Count IV.

### IV.    Count V – Negligence.

In Count V, CBE claims that Pillsbury has been negligent with respect to the Deposit, "when it unlawfully refused to turnover [sic] CBE's funds after November 13, 2012." First Amended Third Party Complaint, ¶ 106. For support, CBE relies on *Miller v. Quarles*, 242 Va. 343, 410 S.E.2d 639 (1991). *Miller v. Quarles* stands for the proposition that an agent can be held liable for negligent performance under a contract to which its principal is a party. Pillsbury takes issue with the alignment of the parties in this case, relative to *Miller v. Quarles*. The more fundamental point, though, is that in *Miller v. Quarles*, after receipt of the $50,000 deposit, and after assuring Miller that "no money was to be at risk at any time except the $5,000 [for

incidental expenses]," Quarles wired the deposit to a loan broker in Europe whom he barely

knew. 410 S.E.2d at 641. The trial court described these acts as "bizarre and capricious." *Id.*

Again, there just isn't any evidence in this case that the Deposit has been lost. It hasn't

been wired anywhere. Pillsbury is still holding on to it, subject to a determination by this Court

of which party is entitled to it. Count V fails because CBE has not alleged any negligent acts on

the part of Pillsbury. The Court will grant summary judgment on Count V.

### Conclusion

All of the Counts remaining in CBE's First Amended Third Party Complaint rest on the

idea that Pillsbury has exercised improper control of the Deposit, by refusing to return it to CBE

after CBE has made a demand for it. CBE's First Amended Third Party Complaint simply

ignores the fact that Chesapeake Trust has an arguable claim to the funds. Pillsbury has done

nothing wrongful in retaining the funds, pending a Court determination of their rightful owner.

For the foregoing reasons, the Court will enter a seperate Order which will provide**:**

1.      The Third Party Defendants' Motion for Summary Judgment is granted. Counts II

through V of the First Amended Third Party Complaint are dismissed.

2.      The Clerk will mail copies of this Order, or provide cm-ecf notice of its entry, to

counsel for the parties below.

Date: Apr 23 2014

/s/ Brian F. Kenney
_____
Brian F. Kenney
United States Bankruptcy Judge

Entered on Docket: April 24, 2014

22

Copies to:

Jerry Lane Hall, Esquire
Pillsbury Winthrop Shaw Pittman LLP
2300 N Street, N.W.
Washington, DC 20037
Counsel for the Plaintiff and Third Party Defendants
Patrick J. Potter and Pillsbury Winthrop Shaw Pittman LLP

Steven S. Biss, Esquire
Law Office of Steven S. Biss
300 West Main Street
Suite 102
Charlottesville, VA 22903
Counsel for the Defendant